IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| RACHELLE ELAINE CALDWELL, | : | Case No. 4:12 CV 2172 |
| Plaintiff, | : | |
| v. | : | |
| MICHAEL ASTRUE, COMMISSIONER OF SOCIAL SECURITY, | : | MEMORANDUM DECISION AND ORDER |
| Defendant. | : | |
| | : | |

## I. INTRODUCTION.

In accordance with the provisions of 28 U. S. C. § 636(c) and FED. R. CIV. P. 73, the parties consented to have the undersigned United States Magistrate Judge conduct any and all proceedings in this case.  Plaintiff seeks judicial review of Defendant's final determination denying her claims for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI, respectively, of the Social Security Act (Act).  The issues before the Court are presented in Briefs filed by the parties (Docket Nos. 17 & 18).  For the reasons that follow, the Magistrate Judge reverses the Commissioner's decision and remands the case to the Commissioner pursuant to Sentence 4 of 42 U. S. C. § 405(g).

## II. PROCEDURAL BACKGROUND.

On September 21, 2009, Plaintiff filed applications for DIB and SSI in which she alleged that her disability began on February 13, 2008 (Docket No. 10, pp. 121-124; 127-129 of 941). The applications were denied both initially and upon reconsideration (Docket No. 10, pp. 79-82; 83-85l 88-89; 90-92 of 941). Plaintiff filed a timely request for an administrative hearing (Docket No. 10, p. 16 of 941). The hearing was conducted on June 3, 2011, at Akron, Ohio, before Administrative Law Judge (ALJ) Hilton R. Miller (Docket No. 10, p. 37 of 941). The ALJ rendered an adverse decision on June 17, 2011, and the Appeals Council denied review of that decision on July 20, 2012 (Docket No. 10, pp. 6-8; 19-32 of 941).

A.    THE ADMINISTRATIVE HEARING.

Plaintiff, represented by counsel, and Lynn S. Smith, an impartial Vocational Expert (VE), appeared and testified.

1.    PLAINTIFF'S TESTIMONY

In June 2011, Plaintiff was 42 years of age, had a general equivalency degree and had been married to her current spouse for ten years. Plaintiff had four children, three of whom were adults and one was four years old. Her spouse was employed at General Motors as an inspector of parts and his net income was approximately $14,400 per annum (Docket No. 10, pp. 46-47, 55, 67 of 941).

Plaintiff testified that her career consisted primarily of three jobs: (1) an auto parts driver; (2) a dietary aide and (3) a supervisor in the plastic molding injection plant of Dinesol Plastics. Plaintiff worked in 1986, stopped working from 1987 to 1990 and commenced working again in 1991 for at least half of the year. She did not recall for whom she worked during the 1990s but noted that the sporadic work history that preceded 1999 was due, in part, to raising her children

2

(Docket No. 10, pp. 47-50 of 941; www.dinesol.com).

As supervisor at Dinesol, Plaintiff's income increased to approximately $20,000 per annum from 2001 through 2006. Then in 2006 and 2007, Plaintiff's income decreased for the reasons that her emotional issues with her spouse interfered with her job performance. Plaintiff was constructively terminated from Dinesol on February 13, 2008 when she was omitted from the upcoming work schedule (Docket No. 13, pp. 50-53 of 941).

After undergoing knee surgery on April 22, 2008, Plaintiff stopped seeking employment because her health began to decline. Her knee began to "act up" and it started to swell[1]. She developed colitis, inflammation of the inner lining of the colon, which caused severe abdominal pain, nausea, vomiting and frequent urination. In addition, Plaintiff battled symptoms associated with degenerative back and neck disease and nerve damage in her arm. An injection in her neck was not effective in relieving the symptoms and the numbness in her wrist was so severe that she could not use her hands to hold, grasp or manipulate. She required assistance with signing her name, putting on her brassiere and brushing her hair. Plaintiff could not drive because she could not grip a steering wheel (Docket No. 10, pp. 51; 53-55; 56-57; 58l 67-68 of 941).

Plaintiff estimated that she could lift a gallon of milk if she could use both hands[2]. She could sit for ten minutes before she had to stand and Plaintiff could walk the length of "this hallway one and a half times" or for five minutes. After five minutes her hips would begin to bother her and her right knee would swell. Plaintiff's knees were subject to replacement but the surgery was

---

[1]

Because of knee stiffness, Plaintiff requested permission to stand at this juncture of the hearing (Docket No. 10, p. 54 of 941).

[2]

A gallon of whole milk can weigh between weighs 8.5 and 8.8 pounds. Answers.ask.com

contraindicated because of her age.  Rather she used ice packs, heating pads, elevating her legs and pain medicine for temporary knee relief (Docket No. 13, pp. 57, 58, 59 of 941).

      **2.**      THE VE'S TESTIMONY.

VE Smith certified that her opinion was not in conflict with the information provided in the DICTIONARY OF OCCUPATIONAL TITLES (DOT) (Docket No. 10, p. 60 of 941).  Initially, the VE characterized Plaintiff's most recent vocational background accordingly:

| JOB & DOT | PHYSICAL EXERTION | SKILL LEVEL | SPECIFIC VOCATIONAL PREPARATION |
|---|---|---|---|
| Laborer 922.687-058 | Medium work involves lifting more than 50 pounds at a time with frequent lifting of carrying of objects weighing up to 25 pounds. 20 C. F. R. §§ 404.1567 (c), 416.967(c). | **Unskilled** work requires little or no judgment to do simple duties that can be learned on the job in a short period of time. 20 C. F. R. §§ 404.1568(a); 416.968(a). | The amount of lapsed time required by a typical worker to learn the techniques, acquire the information and develop the facility needed for average performance of this job is a level **2**, or anything beyond short demonstration up to and including one month. |
| Assistant manager 185.167-046 | Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  A job in this category requires a good deal of walking. 20 C. F. R. §§ 404.1567(b), 416.967(b). | **Semi-skilled** work needs some skills but does not require doing the more complex work duties. 20 C. F. R. §§ 404.1568(b); 416.968(b). | The amount of lapsed time required by a typical worker to learn the techniques, acquire the information and develop the facility needed for average performance of this job is a level **4**, or over three months up to and including six months. |
| Dietary aide 319.677-014 | Medium | Unskilled | 2 |
| Delivery driver 299.477-010 | Medium | Unskilled | 2 |

(Docket No. 10, pp. 61-62 of 941).

In the first hypothetical, the VE was asked to consider an individual of Plaintiff's age, education and work experience and the residual functional capacity to:

    (1) lift and/or carry up to 50 pounds occasionally, (2) lift and/or carry 25 pounds frequently; (3) stand and/or walk with normal breaks for a total of approximately six hours in an eight-hour work day; (4) sit with normal breaks for a total of about six hours in an eight-hour workday; (5) climb ramps and stairs occasionally; (6) refrain from climbing with ladders, ropes or scaffolds; (7) bend and squat occasionally; (8) refrain from operating foot controls or foot pedals due to disorders of the knees; (9)

refrain from engaging in fine and gross manipulation with the bilateral upper extremities frequently; (10) alternate between sitting and standing; and (11) further taking into consideration non-exertional limitations to the performance of simple and routine tasks that involve minimal social interaction on a brief and superficial basis (Docket No. 10, p. 63 of 941).

The VE replied that of the jobs considered "past relevant work," Plaintiff could still perform as a delivery driver (Docket No. 10, pp. 63-64 of 941).

Plaintiff's counsel proposed the second hypothetical individual who is:

(1) limited to lifting 10 pounds occasionally and five pounds frequently; (2) able to sit for ten consecutive minutes before standing for ten minutes; (3) able to access the bathroom every ninety minutes; and (4) limited to simple, repetitive tasks, minimal social interaction on a brief and superficial basis.

The VE responded that this hypothetical individual could not return to Plaintiff's past relevant work and there would be no skills that would transfer to the residual functional capacity assessment (Docket No. 10, pp. 64-65 of 941).

If the hypothetical included no foot controls or foot pedals, the delivery job would be excluded from the past relevant work since the delivery driver position requires the frequent use of foot pedals (Docket No. 10, p. 66 of 941).

Considering the factors listed in the first hypothetical and adding the additional factor that the hypothetical individual would be off task for 18% of the time due to pain and loss of mobility, the VE opined that this would affect maintainability to the point that there would be no jobs that the hypothetical individual could perform (Docket No. 10, p. 67 of 941).

### III.  THE MEDICAL EVIDENCE

Medical evidence is the cornerstone for the determination of disability under Title XVI. Plaintiff is responsible for providing medical evidence from sources who have treated or evaluated her, determined that the alleged impairments existed and assessed the severity of these impairments.

5

What follows is a summary of Plaintiff's medical history and treatments that are material to the determination of disability.

### A.    PHYSICAL IMPAIRMENT EVIDENCE AVAILABLE TO THE ALJ.

 Dr. John P. Delliquadri, D. O., an osteopath, began treating Plaintiff on August 4, 1989, primarily for tension cephalgia  and low back pain.  The following month on September 7, 1992, Plaintiff was involved in a motor vehicle accident and her head collided with the windshield.  The impact precipitated severe neck discomfort, upper back pain and cephalgia. After diagnosing Plaintiff with post-concussion syndrome, Dr. Delliquadri prescribed various pain medications to resolve continued headaches, discomfort, cervical strain, neck discomfort and back pain.  In April 1995, Dr. Delliquadri noted that Plaintiff had early onset osteoarthritis.   In June 1995, Dr. Delliquadri added Zoloft to Plaintiff's drug therapy to relieve anxiety (Docket No. 10, pp. 387, 390, 391; 394 of 941).        Dr. Delliquadri recommended that Plaintiff consult with Dr. Robert J. Marx, D. O, a surgeon, on January 29, 1996, regarding an abnormal mammogram.  A biopsy of the 2cm lesion in Plaintiff's right breast was recommended (Docket No. 10, p. 384 of 941).

Dr. Delliquadri acknowledged that Plaintiff probably had chronic fibromyalgia.  Over the next few years, he used anti-inflammatory and pain medications to relieve Plaintiff's symptoms, addressing particularly the chronic, intense pain, swelling and discomfort in Plaintiff's right knee and back.  In January 1997, Plaintiff reported some improvement in the back pain that was the result of a steroid injection into a trigger point that Dr. Delliquadri administered in November 1996. Plaintiff underwent hemorrhoidal surgery in August 2000 and on November 21, 2000, Dr. Delliquadri observed that the surgical wound was healing quite satisfactorily (Docket No. 10, pp. 364; 365; 375; 376; 377-382 of 941).

6

Blood specimen collected on January 18, 2001 showed elevated mean corpuscular volume (MCV) and mean corpuscular hemoglobin (MCH) levels. Plaintiff's "bad" cholesterol[3] level was elevated but her triglyceride level was extremely elevated (Docket No. 10, p. 345 of 941).

On August 17, 2003, Plaintiff was involved in an altercation during which she fell and injured her right arm, right foot, right lower leg and ankle and sustained left wrist cuts across a tendon. The diagnostic imaging of Plaintiff's right wrist showed no evidence of dislocation, fracture or subluxation. The following week, Plaintiff presented to Dr. Delliquadri with persistent dizziness and headaches. Dr. Delliquadri diagnosed her with a concussion and head contusion. Antivert, an anti-nausea medication, was prescribed to resolve the dizziness (Docket No. 10, pp. 342, 361 of 941; www.drugs.com/antivert).

The gynecological cytology report generated from tests administered on September 26, 2004, showed benign cellular changes (Docket No. 10, p. 303 of 941).

The computed tomographic (CT) scan of Plaintiff's brain administered on October 21, 2004 was negative for intracranial hemorrhage, midline shift or mass effect (Docket No. 10, p. 331 of 941).

On November 29, 2004, at the ST. ELIZABETH HEALTH CENTER (SEHC), Plaintiff was diagnosed with acute colitis, weight loss and arthralgias. Dr. John P. Popovec, D. O, noted that empiric antibiotic therapy had been initiated along with steroid therapy (Docket No. 10, pp. 308-309 of 941).

Dr. Sayed M. Yossef, M. D., a gastroenterologist, conducted a consultative examination with

---

[3]

The bad cholesterol or low density lipoprotein is the one that collects in the walls of blood vessels, causing the blockage of atherosclerosis. High LDL levels place an individual at greater risk of heat attack from sudden blood clot in the artery narrowed by atherosclerosis. STEDMAN'S MEDICAL DICTIONARY 230130 (27th ed. 2000).

7

Plaintiff on November 30, 2004.  He recommended serial blood tests administered over a period of time, intravenous hydration and antibiotics and a colonoscopy (Docket No. 10, pp. 304-305 of 941).

On November 29, 2004, Plaintiff presented to SEHC with complaints of nausea, vomiting and diarrhea.  Plaintiff was treated for acute panniculitis and gastroesophageal reflux disease (GERD).  She was discharged on December 2, 2004.  Within 24 hours, she returned with abdominal cramping, watery diarrhea and dry heaves.  Dr. Popovec diagnosed Plaintiff with acute colitis, volume depletion, tobacco abuse and addiction.  Treatment included high dosed steroids, hydrating fluid therapy and potassium chloride replacement therapy (Docket No. 10, pp. 321-328; 340-341 of 941).

From the specimen collected at SEHC on December 16, 2004, Plaintiff's cholesterol levels were elevated and her triglyceride count was higher than the normal reference range (Docket No. 10, pp. 336-338 of 941).

On December 17, 2004, Plaintiff presented to SEHC with a suspected overdose.  However, none of the traditional drugs–amphetamines, barbiturates, cannabinoids, cocaine or opiates--were detected n her urine drug screen.  Her chest and lung fields were clear.  Her lymphocytes were lower than the normal reference range and the amount of alanine aminotransferase in the blood was slightly elevated above the normal reference range (Docket No. 10, pp. 312-315 of 941).

 The hematology report based upon a specimen collected on February 8, 2005, showed an elevated MCV (Docket No. 10, p. 319 of 941).

Laboratory results from the blood specimen collected on April 5, 2005 and April 29, 2005, showed that Plaintiff's MCV and cholesterol levels were consistently elevated (Docket No.10, pp. 293-297; 298-300 of 941).

Plaintiff reported some improvement regarding her pain and discomfort in the low back and left leg with the use of Prednisone on August 9, 2005 (Docket No. 10, p. 356 of 941).

A routine magnetic resonance imaging (MRI) of the lumbar spine was performed on August 29, 2005 at the CLEVELAND CLINIC (CC).  The results showed broad-based disc protrusion in the L5-S1 region, small central disc protrusion at L3-4, disc protrusion and small annular tear at L4-5, small left posterolateral disc protrusion at T11-12 with mild impression on the adjacent thecal sac and the inability to rule out a lesion at T2 (Docket No. 10, pp. 290-291 of 941).

On November 4, 2005, Plaintiff underwent general chemistry tests consisting of coronary assessment and endocrine study at HUMILITY OF MARY HEALTH PARTNERS ST. ELIZABETH'S HEALTH CENTER (HMHP).  Her  cholesterol, iron and triglyceride levels exceeded the normal reference range recommended by the NATIONAL CHOLESTEROL EDUCATION PROGRAM–ADULT TREATMENT PANEL III REPORT endorsed in the *Journal of American Medical Association* (Docket No. 10, pp. 265-267 of 941).

At the CLEVELAND CLINIC on November 16, 2005, Plaintiff was treated for right knee pain with swelling and decreased range of motion.  There was no evidence of a meniscal nor ligamentous tear but there were degenerative changes of the patellofemoral compartment (Docket No. 10, p. 283 of 941).

On January 17, 2006, Dr. Thomas A. Joseph, M.D., an orthopedic surgeon, consulted with Plaintiff on the bilateral knee pain, greater on the right than the left.  Considering Plaintiff's history including medication intake and radiographic studies, Dr. Joseph diagnosed Plaintiff with bilateral patellofemoral degenerative joint disease, right greater than left, with bilateral effusions.  He

recommended a rheumatoid panel, suggested the use of Glucosamine/Chondroitin[4] and physical therapy (Docket No. 10, pp. 288-289 of 941).

On August 15, 2006, Plaintiff presented to Dr. Raymond S. Duffett, M.D., an orthopedic surgeon, with concerns about her right knee.  Dr. Duffett modified the drug therapy, taking Plaintiff off Naprosyn, putting her on Mobic, a non-steroidal anti-inflammatory drug used to treat pain and ordering a stabilizing brace (Docket No. 10, p. 279 of 941).

Plaintiff presented to the HMHP on October 3, 2006 for general blood chemistry examinations.  Her chloride and cholesterol levels were elevated and her protein level was low (Docket No. 10, pp. 276 of 941).

On October 15, 2006, Plaintiff complained of pain in the left lower quadrant.  Diagnosed with post surgical removal of the gallbladder, Dr. Delliquadri made three findings based on a review of the radiographic evidence.  First, the views of the abdomen showed no bowel obstruction, abnormal enlargement of organs, pathological calcification or pelvic mass.  Second, the CT scan showed no inflammatory changes in the pancreas and the abdominal aorta was normal.  Third, the inflammatory changes in the colon were markedly improved from the previous scan performed on November 29, 2004 (Docket No. 10, pp. 166; 268-274 of 941).

Plaintiff underwent a mammography screening on November 9, 2006.  There was no evidence of malignancy (Docket No. 10, p. 267 of 941).

Plaintiff presented to the ST. JOSEPH HEALTH CENTER emergency room (ST. JOSEPH) on June 6, 2007, after an apparent suicide attempt.  Plaintiff was hospitalized for approximately seven

---

[4]

    Glucosamine and chondroitin act as a cushion between the bones in a joint.  Many people use them together because of the belief that they will slow joint destruction and relieve pain. Http://arthritis.webmed.com/tc/glucosamine-and-chondroitin-topic-overview

days until her condition stabilized.  The laceration of her left forearm was repaired and she was admitted to the psychiatric floor for treatment of extreme depression.  The provisional diagnosis included a mood disorder, NOS, alcohol abuse and cocaine abuse.  Her global assessment of functioning was indicative of behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or the inability to function in almost all areas (ex: stays in bed all day, no job, no home, no friends).  Upon discharge, a plan to maintain stabilization included prescribing psychotropic drugs, enlisted psychoeducation, psychotherapy, conducting certain laboratory studies and finally the assignment of a social worker was implemented.  When Dr. Delliquadri removed the staples on June 14, 2007, Plaintiff admitted that the attempt to end her life

 was drug induced (Docket No. 10, pp. 221-225; 352 of 941).

On July 19, 2007, a vaginal smear was taken, the results of which were negative for intraepithelial lesion or malignancy.  However, Plaintiff's white blood count, triglycerides and "bad" cholesterol levels were elevated and her MCH concentration was lower than normal (Docket No. 10, pp. 257-264 of 941; STEDMAN'S MEDICAL DICTIONARY, 995 (28th ed. 1994)).

Results from the pelvic ultrasound conducted on January 14, 2008, revealed the presence of a 4 cm left adnexal cyst in the left ovary(Docket No. 10, p. 258 of 941).

On March 17, 2008, Dr. Michael P. Stanich, D.O., an orthopedic surgeon, administered an injection in Plaintiff's left knee to stabilize the discomfort arising from osteoarthritis (Docket No. 10, pp. 228-236 of 941).

On March 18, 2008, Dr. Dean R. Ball, D.O., a radiologist, determined that the radiological views of Plaintiff's knees revealed mild degenerative changes and joint space narrowing bilaterally; however, there was no evidence of fracture or dislocation (Docket No. 10, p. 237 of 941).

On April 22, 2008, Dr. Stanich conducted a debridement or removal of all dead tissue in the knee.  On June 2, 2008, Dr. Stanich opined that Plaintiff was doing much better; there was no effusion and no instability of the knee (Docket No. 10, pp. 228-236; 237 of 941).

On February 26, 2008, Plaintiff was in severe pain and discomfort in her knees and back.  Dr. Delliquadri confirmed that there was significant swelling and pain.  Dr. Delliquadri prescribed Prevacid because he was confident that if Plaintiff took it, the symptoms of GERD would improve.  He also addressed recurring severe dysmenorrhea and continued the prescription for Vicodin, an opioid pain reliever (Docket No. 10, p. 350 of 941; www.drugs.com/Vicodin).

On February 28, 2008, Plaintiff underwent a radiological examination of the left knee which showed the presence of arthritis more prominent about the patellofemoral joint.  There was no acute fracture, bone contusion or meniscal tear (Docket No. 10, pp. 251-252 of 941).

During the Summer 2008, Dr. Delliquadri saw Plaintiff three times.  On May 6, 2008, he incised a red and seeping abscess from Plaintiff's face.  On June 13, 2008, he treated the pain in the right sacroiliac by injecting 1cc of Kenalog directly into the affected region.  On July 25, 2008, he addressed the persistent pain resulting from left knee degenerative joint disease and degenerative disc disease lumbar spine and prescribed Symbicort, a combination of a steroid and bronchodilator, to control the symptoms of asthma and chronic obstructive pulmonary disease (Docket No. 10, p. 349 of 941; www.drugs.com/kenalog; www.drugs.com/symbicort).

On November 21, 2008, Dr. Delliquadri prescribed Tramadol, a narcotic-like pain reliever to stabilize intractable pain associated with the lumbar spine.  He continued the prescriptions for pain on January 15, 2009 and March 20, 2009 (Docket No. 10, p. 348 of 941).

From May 4, 2009 through August 7, 2009, Plaintiff treated with Dr. Delliquadri primarily for knee pain.  Dr. Delliquadri described the results from the clinical findings and examination that

12

related to Plaintiff's condition, finding that she had crepitus, deformity and edema in both knees bilaterally and antalgic gait due to knee pain and discomfort.  It was his opinion that Plaintiff was disabled 100% secondary to low back pain and knee pain bilaterally (Docket No. 10, pp. 243-246 of 941).

The specimen taken from the cervical smear on March 10, 2009 showed some epithelial cell abnormality.  When the test was repeated on April 8, 2009, there was no sign of lesion or malignancy (Docket No. 10, pp. 247-249 of 941).  On May 7, 2009, Dr. Delliquadri continued the prescription for Tramadol (Docket No. 10, p. 347 of 941).

Dr. Mary-Helene Massullo, a surgeon, conducted an examination on November 24, 2009, after which she made the following observations:

1.     Plaintiff had abused tobacco and therefore she was not compliant with treatment.
2.     Plaintiff had abused drugs, by history.
3.     Plaintiff had GERD.
4.     Plaintiff was hypertensive, the etiology undetermined transient versus essential.
5.     History of cholectystectomy.
6.     Generalized arthralgia.

Dr. Massullo opined that Plaintiff was of working age and was able to do work related activities such as sitting, standing, lifting, carrying, handling objects, hearing, speaking and traveling.  Plaintiff's mental status appeared normal (Docket No. 10, pp. 405-408 of 941).  The manual muscle testing results showed that Plaintiff could raise her shoulders, elbows, wrists, fingers, hips, knees and feet against the maximal resistence and that Plaintiff had normal grasp, manipulation, pinch and fine coordination, bilaterally.  Moreover, Plaintiff had range of motion within the normal range in her cervical spine, shoulders, elbows, wrists, hands-fingers, dorsolumbar spine, hips, knees and ankles (Docket No. 10, pp. 409-412 of 941).

Utilizing the "As Low As Reasonably Achievable" protocol, the radiological views of the

13

lumbar spine revealed mild lumbar spondylosis including both disc disease and facet osteoarthritis (Docket No. 10, p. 414 of 941).  Images of the knees showed a small spur lateral patellofemoral knee joint (Docket No. 10, p. 415 of 941).

Plaintiff presented to TRUMBULL MEMORIAL HOSPITAL on June 20, 2010 with abdominal pain and diarrhea.  Both the CT scan of the pelvis and abdomen showed abnormal bowel wall thickening involving the entire colon.  It was suspected that Plaintiff had inflammatory bowel disease or infectious colitis (Docket No. 10, pp. 554-576 of 941).

Dr. Carl R. Schaub, M. D., a hematologist, removed a mole from Plaintiff's nose first on March 11, 2010 and then again on August 31, 2010 (Docket No. 10, pp. 550-554 of 941).

On October 13, 2010, Plaintiff presented to the TRUMBULL MEMORIAL HOSPITAL with left lower quadrant abdominal pain and lower back pain accompanied by nausea, vomiting and diarrhea. Given her history of acute sigmoid colitis, Plaintiff was admitted into the hospital based on a preliminary diagnosis of possible diverticulitis.  A thorough examination was conducted, including a chest X-ray and pelvic ultrasound.  The chest X-rays showed no evidence of acute intrathoracic abnormality.  Results from the pelvic ultrasound showed two ovarian cysts measuring about 2.8 cm. Treatment included intravenous fluids and antibiotics (Docket No. 10, pp. 445-481; 482-517; 546-548; 582-610 of 941).

Plaintiff underwent a CT examination of the abdomen on October 24, 2010, the results of which were within normal limits.  Results from the CT scan of the pelvis showed a 2.7 cm right ovarian cyst (Docket No. 10, pp 543; 640-650 of 941).

Plaintiff returned to ST. JOSEPH'S on November 5, 2010 and was diagnosed with paresthesia, NOS, from cervical disc disease.  The X-rays confirmed degeneration at C5-C6 and C6-C-7, spurring and severe neuroforaminal narrowing, worse on the right (Docket No. 10, pp. 518-528 of

941).

On November 23, 2010, Plaintiff complained of right arm numbness.  An MRI of the spine was administered.  The results showed that at C4-C5, there was mild degeneration and slight bulging of the disc but no neuroforaminal or central canal stenosis; at C5-C6, there was reversal of the usual curvature and degeneration with broad-based bulging of the disc at C6-C7, and there was a 6 x 7 mm disc extrusion (Docket No. 10, pp. 529-530; 536-537; 539-540 of 941).

The following week, Gabapentin a.k.a. Neurontin, a medication used to prevent pain related responses to neuropathic pain, was added to the ongoing regimen which included Vicodin and Tramadol.  Dr. Delliquadri noted that Plaintiff's symptoms were slowly showing some slight improvement (Docket No. 10, p. 531 of 941; STEDMAN'S MEDICAL DICTIONARY, 2006 WL 384572 (2006)).

On November 30, 2010, Plaintiff presented to the TRUMBULL MEMORIAL HOSPITAL with a headache and vomiting.  No acute intracranial abnormality was identified.  To resolve the symptoms, an IV infusion was administered (Docket No. 10, pp. 538; 611-621 of 941).

Dr. Delliquadri saw Plaintiff on December 17, 2010 and continued the prescription for Gabapentin to assist with relieving chronic neck pain and discomfort (Docket No. 10, p. 684 of 941).

On December 26, 2010, Plaintiff presented to TRUMBULL MEMORIAL HOSPITAL with upper abdominal pain radiating to the left abdomen with vomiting and diarrhea.  Diagnosed with diverticulitis, Plaintiff's drug therapy was supplemented with Cipro®, a medication used to treat and prevent infections that are proven or strongly suspected being caused by bacteria and Flagyl, a medication used to treat bacterial infections of the stomach, skin and joints (Docket No. 10, pp. 623-639 of 941; PHYSICIAN'S DESK REFERENCE, 2006 WL 389537 (2006); www.drugs.com/flagyl.html)

On January 17, 2011, Plaintiff presented to TRUMBULL MEMORIAL HOSPITAL with a migraine

15

headache.  An infusion was administered to relieve pain (Docket No. 10, pp. 657-664 of 941).

Plaintiff presented to the TRUMBULL MEMORIAL HOSPITAL with complaints of abdominal pain.  Diagnosed with gastroenteritis, Plaintiff was given an infusion for pain and instructed to consume only a clear liquid diet (Docket No. 10, pp. 665-676 of 941).

TRUMBULL MEMORIAL HOSPITAL personnel referred Plaintiff to ONE HEALTH OHIO, a comprehensive service designed to provide community-based healthcare for the under-insured and uninsured.  During the general adult intake interview conducted on March 11, 2011, Plaintiff discussed her medical history, focusing primarily on the diagnoses of GERD, diverticulitis, neck, knee and back pain (Docket No. 10, pp. 680-683 of 941; www.onehealthohio.org).

Plaintiff presented to Dr. Delliquadri on March 11, 2011 and April 14, 2011 with chronic neck pain and discomfort as well as pain in the back, knees and ankles.  In both instances, her medications were continued, adding Neurontin to the drug regimen in March and adding Cephyalexin, another medication used to treat infections caused by bacteria, to the drug regimen in April (Docket No. 10, pp. 683; 684 of 941; www.drugs.com/cephalexin.html).

### B.  MENTAL EVALUATIONS AVAILABLE TO THE ALJ.

Dr. Stanley J. Palumbo, Ph. D., a clinical psychologist, conducted a clinical evaluation on November 23, 2009, and made the following diagnostic impressions:

1.  Axis I represents impairments that are most familiar and widely recognized and need treatment.  Plaintiff had a dysthymic disorder.
2.  Axis II is for assessing personality disorders and intellectual disabilities.  These disorders are usually lifelong problems that first arise in childhood, distinct from the clinical disorders of Axis I which are often symptomatic of Axis II.  Dr. Palumbo made no diagnosis.
3.  Axis III describes physical problems that may be relevant to diagnosing and treating mental disorders.  Dr. Palumbo described Plaintiff's physical problems as including arthritic pain, joint pain and frequent headaches.
4.  Axis IV is for reporting psycho-social and environmental stressors that may affect the diagnosis, treatment, and prognosis of mental disorders.  Dr. Palumbo determined

that the current level of psycho-social stressors "moderate unemployed."

5. Axis V is for Global Assessment of Functioning (GAF), a reflection of the evaluating clinician's judgement of a patient's ability to function in daily life.  The 100 point scale measures psychological, social and occupational functioning.  Here a score of 48 denotes serious symptoms (ex: suicidal ideation, severe obsessive rituals) OR any serious impairment in social, occupational, or school functioning (ex: no friends, unable to hold a job).  Functionally, Plaintiff's GAF would not exceed 50, an indicator of serious symptoms or any serious impairment in social, occupational, or school functioning (Docket No. 10, pp. 402-403 of 941).

Summarizing the interview, Dr. Palumbo concluded that due to irritability, low energy, impaired sleep, tearfulness, frequent fleeting suicidal ideations and strong feelings of guilt, Plaintiff's abilities to relate to fellow employees, supervisors and the public; understand and follow instructions; maintain attention and perform simple repetitive tasks; and withstand stress and pressures associated with day to day work activity, were moderately impaired (Docket No. 10, p. 402 of 941).

On December 5, 2009, Dr. Catherine Flynn, Psy. D., completed a PSYCHIATRIC REVIEW TECHNIQUE for the period of February 13, 2008 through December 2, 2009, and a current MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT.  It was Dr. Flynn's opinion that Plaintiff had a medically determinable impairment that did not precisely satisfy the diagnostic  criteria, namely, dysthymic disorder (Docket No. 10, p. 419 of 941).   The degree of the following functional limitations that exists as a result of Plaintiff's mental disorder:

1. Restriction of Activities of Daily Living                                     Mild
2. Difficulties in Maintaining Social Functioning                          Moderate
3. Difficulties in Maintaining Concentration, Persistence or pace    Moderate
4, Episodes of Decompensation, each of extended duration            One or two

(Docket No. 10, p. 426 of 941).

Dr. Flynn found that Plaintiff's statements were partially credible.  While her  symptoms were severe enough to pose a limitation, they were not severe enough to prevent work that is low

stress.  Plaintiff had no marked limitations in the ability to understand and remember, engage in

sustained concentration and persistence, social interaction and adaptation.  However, Plaintiff had

moderate limitations in the abilities to:

1.  Carry out detailed instructions.
2.  Maintain attention and concentration for extended periods.
3.  Perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances.
4.  Work in coordination with or proximity to others without being distracted by them.
5.  Complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.
6.  Accept instructions and respond appropriately to criticism from supervisors.
7.  Get along with co-workers or peers without distracting them or exhibiting behavioral extremes.
8.  Maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.
9.  Respond appropriately to changes in the work setting.

(Docket No. 10, pp. 430-433 of 941).

C.  PHYSICAL IMPAIRMENT EVIDENCE SUBMITTED TO THE APPEALS COUNCIL.

Plaintiff presented to ST. JOSEPH on May 5, 2011 and again on May 8, 2011, with pelvic

pain.  The nonspecific abdominal pain was likely attributable to the presence of ovarian cysts and/or

colitis/diverticulitis.  She was referred to her primary care physician (Docket No. 10, pp. 697-704;

709-722; 729-731; 732-733; 735 of 941).

On May 9, 2011, Plaintiff presented to ST. JOSEPH'S with complaints of abdominal pain.

There was no evidence of acute intra–abdominal pathology or pelvic mass (Docket No. 10, pp. 706

of 941).

On May 19, 2011, Plaintiff, accompanied by her husband, presented to ST. JOSEPH for

emergency care with complaints of pain in her right shoulder which radiated down her arm to her

hand.  Dr. Alisa Roberts, D.O., an emergency medicine physician, conducted an electrocardiogram,

18

the results of which were within normal limits.  Dr. Roberts diagnosed Plaintiff with shoulder strain for which she administered pain relievers while confined to the hospital (Docket No. 10, pp. 690-696 of 941).

Plaintiff consulted with Dr. Holly J. Maggiano, M. D., a neurologist, on or about May 31, 2011.  Dr. Maggiano injected Depo Medrol®, an anti-inflammatory glucocorticoid, directly into Plaintiff's upper back and suggested that Plaintiff would benefit from some physical therapy and flexibility exercise (Docket No. 10, pp. 727-728 of 941; PHYSICIAN'S DESK REFERENCE, 2006 WL 384673 (2006)).

In June 2011, Plaintiff presented to Dr. Delliquadri for pain and discomfort in the neck region.  Medication was prescribed to be used every four hours as needed for breakthrough pain (Docket No. 10, p. 726 of 941).

On July 5, 2011, a baseline study of Plaintiff's breasts was made.  Because of the findings in the mammogram, a sonogram of the right breast was performed (Docket No. 10, pp. 687-689 of 941)

Dr. Delliquadri continued the prescriptions for Vicodin and Tramadol on July 15, 2011 (Docket No. 10, p. 726 of 941).

Plaintiff presented to TRUMBULL MEMORIAL HOSPITAL on August 9, 2011, with complaints of a headache that had persisted for six days.  Diagnosed officially with a migraine headache, Plaintiff was discharged with home/self care which included medication designed to combat pain and prevent nausea (Docket No. 10, pp. 774-781 of 941).

On August 15, 2011, Plaintiff was transported to the TRUMBULL MEMORIAL HOSPITAL by emergency medical ground transportation with complaints of chest pain.  It was determined that Plaintiff suffered from chest pain, non-cardiac, so a prescription for Naprosyn was dispensed

(Docket No. 10, pp. 754-773 of 941).

Plaintiff presented to HUMILITY OF MARY HEALTH PARTNERS on August 22, 2011 for treatment of neck pain.  She was discharged once she received the medication for pain (Docket No. 10, pp. 745-750 of 941).

On October 4, 2011, Plaintiff underwent a hysterectomy (Docket No. 10, pp. 796-801 of 941).

On October 18, 2011, Dr. Delliquadri administered Prednisone and recommended a breast reduction to decrease Plaintiff's back pain (Docket No. 10, p. 832 of 941).

Plaintiff presented to HMHP on October 22, 2011 with a right arm injury.  There was some indication that her primary care physician was attempting to get Plaintiff into a pain management clinic.  Nevertheless, Plaintiff was diagnosed and treated for a pinched nerve in her neck (Docket No. 10, pp. 802-808 of 941).

Plaintiff presented to TRUMBULL MEMORIAL HOSPITAL on October 24, 2011, with chronic neck pain and cervical radiculopathy (Docket No. 10, pp. 883-884 of 941).

Plaintiff presented to HMHP on October 27, 2011 and October 29, 2011, with pain in her arm, neck and right shoulder.  The problems were occurring constantly and the symptoms were aggravated by activity.  A diagnostic discogram was used to find the cause of the serious back or neck pain (Docket No. 10, pp. 809-829 of 941).

On November 9, 2011, Plaintiff underwent radiographic imaging of the cervical spine.  The results showed vertebral bodies and the straight normal narrow signal and height.  Space narrowing and desiccation with degenerative endplate changes anterior osteophytic spurring with posterior spondylitic ridging was noted at C5-C6 and C6-C7.  There was disc bulging and posterior spondylitic ridging bilateral uncinate process hypertrophy resulting in mild spinal canal stenosis

measuring 8.8 mm in AP dimension at C5-C6 and circumferential disc bulging with broad based central disc protrusion measuring 14 by 5 millimeters in transverse and AP dimensions at C6-C7 (Docket No. 10, p. 893 of 941).

Dr. Delliquadri addressed increased pain and discomfort in Plaintiff's neck on November 11, 2011. Plaintiff commenced taking Cozaar®, a medication used to treat hypertension (Docket No. 10, p. 832 of 941; PHYSICIAN'S DESK REFERENCE, 2006 WL 374505 (2006)).

Plaintiff presented to TRUMBULL MEMORIAL HOSPITAL on November 29, 2011, with complaints of abdominal pain. Lab results from chemical tests showed above high normal white blood count and red distribution width. The right ovarian cyst measured 3.4 cm. Medication was dispensed for the immediate resolution of pain. Plaintiff was discharged with prescriptions for Percocet, Prevacid and Motrin (Docket No. 10, pp. 869-882 of 941).

Dr. Delliquadri recommended that Plaintiff undergo an esophagogastroduodenoscopy and colonoscopy on December 9, 2011 (Docket No. 10, p. 832 of 941).

On December 12, 2011, Dr. Crawford F. Barnett, M. D., who specialized in internal medicine, considered Plaintiff for the ST. JOSEPH PAIN MANAGEMENT CENTER. Based on her medical history and certain provocative maneuvers, Dr. Barnett acknowledged that Plaintiff had cervical axial pain; cervical radiculopathy; cervical disc displacement; cervical spinal and neurofibromatosis stenosis. He proposed that Dr. Delliquadri stay the course, monitoring Plaintiff's medication and subjecting her to a series of three cervical epidural steroid injections. Dr. Barnett did not prescribe any new medications (Docket No. 10, pp. 862-865 of 941).

The diagnostic images of Plaintiff's lumbar spine taken on February 1, 2012 showed minimal stable degenerative facet joint arthropathy and endplate changes. There was no evidence of fracture or dislocation. There was a light diffuse disc bulge at L1-L2; a small disc bulge at L2-L3; broad-

based disc bulge at L3-L4; slight disc bulge at L4-L5 and mild facet arthropathy at LS-S1 (Docket No. 10, pp. 891-892 of 941).

Dr. Delliquadri treated Plaintiff for continued pain and discomfort in her neck on January 12, 2012.  Addressing the degenerative disc disease of the lumbar spine, degenerative disc disease cervical spine and right knee degenerative joint disease, Dr. Delliquadri prescribed medication used to relieve pain as well as medication designed to regulate blood pressure and diffuse sweating (Docket No. 10, p. 860 of 941).

Plaintiff presented to the TRUMBULL MEMORIAL HOSPITAL on February 1, 2012, with right hip pain.  The MRI obtained of the lumbar spine showed no fracture or dislocation but did show the following:

a.      slight diffuse disc bulge at L1-L2.
b.      small disc bulge at L2-L3.
c.      broad-based disc bulge at L3-L4
d.      slight disc bulge at L4-L5.
e.      mild facet arthropathy at L5-S1.

(Docket No. 10, pp. 858-859 of 941).

After getting involved in a street fight on February 12, 2012, Plaintiff suffered an injury to her left eye.  She presented to the TRUMBULL MEMORIAL HOSPITAL on February 14, 2012.  Upon examination, Dr. Steven E. Frank, M.D., an emergency medicine physician, determined that there was evidence of left inferior orbital wall fracture of indeterminate age (Docket No. 10, pp. 897; 935-941 of 941; www.healthgrades.com/physician/dr-steven-frank-yyyf6).

Dr. Delliquadri treated Plaintiff for congestion, drainage, coughing and ear pain.  At this juncture, the low back pain was radiating into Plaintiff's legs.  Pain medication and a steroid were prescribed (Docket No. 10, p. 902 of 941).

> **D.**    **MEDICAL IMPAIRMENT EVIDENCE SUBMITTED TO THE APPEALS COUNCIL.**

Plaintiff self referred to VALLEY COUNSELING SERVICES (VCS) and on April 4, 2012, Suzanne Paluga conducted a clinical narrative.  Notably, Plaintiff admitted that she had used crack when younger and quit when her son was born.  Her husband reintroduced her to crack during the past four years and she had been using one or twice a week since then.  Ms. Paluga made the following diagnosis:

1.    Axis I represents impairments that are most familiar and widely recognized and need treatment.  Plaintiff had a mood disorder, not otherwise specified, and a cocaine related disorder, not otherwise specified.

2.    Axis II is for assessing personality disorders and intellectual disabilities.  These disorders are usually lifelong problems that first arise in childhood, distinct from the clinical disorders of Axis I which are often symptomatic of Axis II.  Ms. Paluga did not make a diagnosis.

3.    Axis III describes physical problems that may be relevant to diagnosing and treating mental disorders.  Plaintiff's physical problems included rheumatoid arthritis and chronic pain.

4.    Axis IV is for reporting psychosocial and environmental stressors that may affect the diagnosis, treatment, and prognosis of mental disorders.  Plaintiff had problems with her primary support group, namely, her spouse.

5.    Axis V is for Global Assessment of Functioning (GAF), a reflection of the evaluating clinician's judgement of a patient's ability to function in daily life.  The 100 point scale measures psychological, social and occupational functioning.  Here, Ms. Paluga gave Plaintiff a score of 48 which denotes serious symptoms (ex: suicidal ideation, severe obsessive rituals) OR any serious impairment in social, occupational, or school functioning (ex: no friends, unable to hold a job).  Functionally, Plaintiff's GAF would not exceed 50, an indicator of serious symptoms or any serious impairment in social, occupational, or school functioning.

(Docket No. 10, pp. 914-930 of 941).

Ms. Lori Funkhouser conducted an initial psychiatric evaluation for VCS on April 12, 2012, and made the following diagnosis:

1.    Axis I represents impairments that are most familiar and widely recognized and need treatment.  Ms. Funkhouser determined that Plaintiff's impairment met the criteria for a mood disorder, NOS and a cocaine-related disorder.

2.    Axis II is for assessing personality disorders and intellectual disabilities.  Ms. Funkhouser did not make a diagnosis at Axis II.

23

3.      Axis III describes physical problems that may be relevant to diagnosing and treating mental disorders. Ms. Funkhouser determined that Plaintiff had rheumatoid arthritis and chronic pain.

4.      Axis IV is for reporting psychosocial and environmental stressors that may affect the diagnosis, treatment, and prognosis of mental disorders. Ms. Funkhouser suggested that Plaintiff had problems with her primary support group, particularly, her spouse.

5.      Axis V is for Global Assessment of Functioning (GAF), a reflection of the evaluating clinician's judgement of a patient's ability to function in daily life. The 100 point scale measures psychological, social and occupational functioning. Here, Ms. Funkhouser attributed a score of 48 which denotes serious symptoms (ex: suicidal ideation, severe obsessive rituals) OR any serious impairment in social, occupational, or school functioning (ex: no friends, unable to hold a job). Functionally, Plaintiff's GAF would not exceed 50, an indicator of serious symptoms or any serious impairment in social, occupational, or school functioning.

(Docket No. 10, p. 911 of 941).

## IV. STANDARD OF DISABILITY DETERMINATION

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C. F. R. § 404.1520, and 20 C. F. R. § 416.920 respectively. DIB and SSI are available only for those who have a "disability." *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U. S. C. § 423(a), (d); *See also* 20 C.F.R. § 416.920). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C. F. R. § 416.905(a) (same definition used in the SSI context)).

To determine disability under Sections 404.1520 and 416.920, a plaintiff must first demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (*citing Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant

24

a finding of disability.  *Id.*  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience.  *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled.  *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.  *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001)(internal citations omitted) (second alteration in original)).  If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates.  *Id.* (*citing* 20 C. F. R. § 404.1520(a)(4); 20 C. F. R. § 416.920(a)(4)).

### B. SUMMARY OF THE ALJ'S FINDINGS.

After careful consideration of the entire record, the ALJ made the following findings:

1.  Plaintiff met the insured status requirements of the Act through December 31, 2012.
2.  Plaintiff had not engaged in substantial gainful activity since February 13, 2008, the alleged onset date.
3.  Plaintiff had the following severe impairments:  (1) colitis; (2) degenerative disc disease; and (3) dysthymic disorder.
4.  Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F. R. art 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, 416.926).
5.  After careful consideration of the entire record, the undersigned found that Plaintiff had the residual functional capacity to perform medium work as defined in 20 C. F. R. §§ 404.1567(c) and 416.967(c), except that she:  (1) may sit, with normal breaks, for up to six hours of an eight-hour workday; (2) may stand and/or walk, with normal breaks for up to six hours in an eight-hour workday; (3) must have the option to sit or stand at will, for comfort; (4) may occasionally bend, squat, climb ramps and stairs; (5) may never climb ladders, ropes or scaffolds; (6) is limited to no more than

25

frequent operation of foot controls or foot pedals, due to an impairment of the knees; (7) is limited to no more than frequent find and gross manipulation of the upper extremities and (8) is further limited to the performance of simple and routine tasks that involve minimal social interaction on a brief and superficial basis.

5.      Plaintiff is capable of performing past relevant work as a delivery driver, having a medium exertional level designation and a specific vocational preparation factor of two.  This work does not require the performance of work-related activities precluded by Plaintiff's residual functional capacity.

6.      Plaintiff has not been under a disability as defined in the Act from February 13, 2008 through the date of the decision on June 17, 2011.

(Docket No. 10, pp. 22-32 of 941).

## V. THIS COURT'S JURISDICTION, SCOPE AND STANDARD OF REVIEW.

A district court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  This Court has jurisdiction over the final ruling of the district court pursuant to 28 U.S.C. § 1291, 42 U.S.C. § 405(g), and 42 U.S.C. § 1383(c)(3).

Congress has provided a limited scope of review for Social Security administrative decisions under 42 U.S.C. § 405(g).  The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive.  *McClanahan v. Commissioner of Social* Security, 474 F.3d 830, 833 (6th Cir. 2006) (*citing* 42 U. S. C. § 405(g)).  The court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence.  *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-627 (6th Cir. 1967)).

"Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (*citing Besaw v. Secretary of Health and Human Services*, 966 F.2d 1028, 1030 (6th Cir. 1992)). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . *Id.*  This is so because there is a

'zone of choice' within which the Commissioner can act, without the fear of court interference."

*Id.* (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

### VII. ANALYSIS.

Plaintiff's claims are:

A.    The ALJ erred in failing to grant substantial weight to the opinions of Dr. Delliquadri, a treating source.
B.    The ALJ erred in his analysis of his pain complaints.
C.    The new evidence submitted subsequently to the hearing warrants remand.

Defendant responded:

A.    The ALJ was not required to give substantial weight to Dr. Delliquadri's conclusion that Plaintiff was disabled.
B.    Substantial evidence supports the ALJ's credibility determination.
C.    The evidence submitted after the hearing was neither new nor material to the finding of disability.

### A.    EXAMINATION OF THE TREATING PHYSICIAN REPORTS.

Plaintiff argues that the ALJ should have closely scrutinized the record and identified the weight given to the opinions of Dr. Delliquadri rather than summarily dismissing this treating source's opinions.  Plaintiff requests that the case be remanded and reversed for the ALJ to perform a proper analysis of Dr. Delliquadri's opinions and provide reasoning for the weight given the opinions.

### 1.    TREATING SOURCE RULE.

In social security cases involving a claimant's disability, the Commissioner's regulations require that if the opinion of the claimant's treating physician is well-supported by medically acceptable clinical and laboratory diagnostic technique and is not inconsistent with the other substantial evidence in the claimant's case record, it will be given controlling weight.  *Johnson v. Commissioner of Social Security*, 652 F. 3d 646, 651 (6th Cir. 2011) (*citing* 20 C. F. R. §

404.1527(d)(2)).  "If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors, namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion."  *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009) (*citing Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004) (*quoted with approval in Bowen v. Commissioner of Social Security*, 478 F.3d 742, 747 (6th Cir.2007)).

In *Wilson v. Commissioner of Social Security,* 378 F.3d 541 (6th Cir.2004), the Sixth Circuit discussed the treating source rule in the regulations with particular emphasis on the requirement that the agency "give good reasons" for not affording controlling weight to a treating physician's opinion in the context of a disability determination.  *Harris v. Commissioner of Social Security*, 2011 WL255523669, *3 (N.D.Ohio,2011).  The court stated that to meet this obligation to give good reasons for discounting a treating source's opinion, the ALJ must do the following:

- State that the opinion is not supported by medically acceptable clinical and laboratory techniques or is inconsistent with other evidence in the case record.
- Identify evidence supporting such finding.
- Explain the application of the factors listed in 20 C.F.R. § 404.1527(d)(2) to determine the weight that should be given to the treating source's opinion. *Id.* (*citing Wilson,* 378 F. 3d at 546).

The Court went on to hold that the failure to articulate good reasons for discounting the treating source's opinion is not harmless error, drawing a distinction between a regulation that bestows procedural benefits upon a party and one promulgated for the orderly transaction of the agency's business.  *Id*.  The former confers a substantial, procedural right on the party invoking it that cannot be set aside for harmless error.  *Id*.

    **2.**       ANALYSIS OF DR. DELLIQUADRI'S OPINIONS.

28

To summarize, the Sixth Circuit has created a rebuttable presumption that a treating source's opinion should receive controlling weight.  The ALJ was required to explain the weight to the opinions of the treating source.  If the weight is not controlling, the ALJ was required to articulate good reasons for not giving those opinions controlling weight.  In articulating good reasons for assigning weight other than controlling, the ALJ had to do more than state that the opinions are not supported by objective medical evidence.  The failure to follow these rules suggests that the ALJ's decision is based on a lack of substantial evidence even if the Court can arrive at the same decision as the ALJ based on evidence in the record.

In judging compliance with the treating source rule, the Magistrate finds that the ALJ considered Dr. Delliquadri a treating source.  The Magistrate even acknowledges that the ALJ was not required to exhaustively discuss or categorically accept Dr. Delliquadri's opinions.  However, the ALJ summarily discounted Dr. Delliquadri's opinions as a whole in one paragraph for the reason that Dr. Delliquadri made a disability determination reserved exclusively to the ALJ (Docket No. 10, p. 30 of 941).  The statements by medical sources to this effect are not dispositive; however, the ALJ must consider the medical findings and evidence that support the statements.  Here, the ALJ failed to follow his own regulations or Sixth Circuit precedent that requires him to undertake an analysis consistent with 20 C. F. R. § 404.1527(c) or provide good reasons for dismissing the opinions

The Magistrate finds that the ALJ's violation of the good reasons rule is not harmless error because the single paragraph discounting Dr. Delliquadri's opinions leaves this Court without a clear understanding of why his opinions as to diagnoses were discredited.  The Magistrate's finding that the ALJ's decision is not supported by substantial evidence is based upon the ALS's violation of the agency's procedural rules.  Even though the ALJ may reach the same conclusion on remand,

Plaintiff has a substantial right to be afforded the procedural protections in the place that the ALJ must use to dispose of her claims.  This issue is remanded to the Commissioner for consideration of Dr. Delliquadri's opinions and its effect, if any, on whether Plaintiff's limitations and whether Plaintiff is disabled.

**B.     THE CREDIBILITY ANALYSIS.**

Plaintiff claims that her medically determinable impairments could reasonably be expected to cause her alleged symptoms such as pain.  The ALJ erred by not considering all of the pain factors and remand is necessary in order for the ALJ to provide a full and fair evaluation of Plaintiff's complaints of pain and how it relates to her credibility.  The Magistrate finds that the primary issue is whether the adverse credibility finding made by the ALJ requires remand because it is not based on objective evidence, therefore violating Sixth Circuit precedent and federal regulations.  .

**1.     THE SIXTH CIRCUIT PRECEDENT AND FEDERAL REGULATORY STANDARDS.**

In many disability cases, the cause of the disability is not necessarily the underlying condition itself, but rather the symptoms associated with the condition.  *Romig v. Astrue,* 2013 WL 1124669, *4 (N.D.Ohio,2013) (*citing* 20 C.F.R. §§ 404.1529 & 416.929; *Wyatt v. Secretary of Health & Human Services*, 974 F.2d 680, 686 (6th Cir.1992) (noting that "this court has previously held that subjective complaints of pain may support a claim for disability")).  It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability.  *Id*. (*see Kirk v. Secretary of Health & Human Services*, 667 F.2d 524, 538 (6th Cir.1981), *cert. denied*, 103 S. Ct. 2428 (1983)).  When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  *Id.*  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment.  *Id.*  Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms."  *Id.* (*citing* POLICY

30

INTERPRETATION RULING TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, SSR 96–7p (July 2, 1996)). Essentially, the same test applies where the alleged symptom is pain, as the Commissioner must

> (1)      examine whether the objective medical evidence supports a finding of an underlying medical condition, and
>
> (2)      whether the objective medical evidence confirms the alleged severity of pain or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Id.* (*see Felisky v. Bowen*, 35 F.3d 1027, 1038–39 (6th Cir.1994); *Duncan v. Secretary of Health & Human Services,* 801 F.2d 847, 853 (6th Cir.1986).

      If the claims are not substantiated by the medical record, the ALJ must make a credibility determination of the individual's statements based on the entire case record. *Id*. at *5 (*citing Felisky*, 35 F. 3d at 1039; *Duncan,* 801 F. 2d at 853).  Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *Id.* (*see Siterlet v. Secretary of Health & Human Services*, 823 F.2d 918, 920 (6th Cir.1987)).  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *Id.* (*see Villareal v. Secretary of Health & Human Services*, 818 F.2d 461, 463 (6th Cir.1987)).  Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for the weight." *Id.* (*citing* SSR 96-7p, PURPOSE SECTION; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so"); *accord Rogers v. Commissioner of Social Security*, 486 F.3d 234, 248 (6th Cir. 2007) ("[B]lanket assertions that the claimant is not believable will not pass muster, nor will explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence.").

Beyond medical evidence, there are seven factors that the ALJ should consider.  *Id.*  The

seven factors are:

(1)     the individual's daily activities;
(2)     the location, duration, frequency, and intensity of the individual's pain;
(3)     factors that precipitate and aggravate the symptoms;
(4)     the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
(5)     treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
(6)     any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and
(7)     any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at fn. 2 (*citing* SSR 96–7p, INTRODUCTION; *see also Cross v. Commissioner of Social Security*,

373 F.Supp.2d 724, 732–733 (N.D.Ohio 2005) (stating that an ALJ, in a unified statement, should

explain his or her credibility findings in terms of the factors set forth in the regulations, thereby

permitting the court to "trace the path of the ALJ's reasoning.").  While the ALJ need not analyze

all seven factors, he or she should show that he considered the relevant evidence. *Id.* (*see Cross*, 373

F.Supp.2d at 733; *Masch v. Barnhart*, 406 F.Supp.2d 1038, 1046 (E.D.Wis.2005)).

2.     THE STANDARD FOR JUDGING CREDIBILITY.

The ALJ consideration of Plaintiff's subjective pain complaints and assessment of her

credibility do not comport with the Administration's requirements for that assessment.  It was not

sufficient for the ALJ to make a single, conclusory statement that Plaintiff's allegations of pain had

been considered or that the allegations were not credible.  It is also not enough for the ALJ to simply

recite the factors that were described in the regulations for evaluating symptoms.  The ALJ's

determination or decision should have contained specific reasons for the finding on credibility,

supported by the evidence in the case record, and he must have been sufficiently specific to make

clear to any subsequent reviewers the weight he gave to the individual's statements and the reasons

for that weight.

The ALJ referenced the two-pronged analysis and acquiesced that he must make a determination under this paradigm.  He proceeded to find that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged pain.  Then he summarily discounted Plaintiff's credibility for the reason that her allegations were not consistent with the ALJ's residual functional capacity finding (Docket No. 10, p. 27 of 941).  The ALJ did not specify what parts of Plaintiff's testimony or what parts of the evidence he used to make such a negative credibility determination or what parts of Plaintiff's testimony he disbelieved.  This is inconsistent with his overall findings that Plaintiff had been diagnosed with an impairment that could account for the symptoms.

Although an ALJ's decision need not discuss and evaluate every piece of evidence relating to Plaintiff's subjective complaints of pain, the ALJ failed to demonstrate that he considered the evidence relating to the limiting effect, if any, on Plaintiff's ability to work.  Notably absent is any analysis that considers Plaintiff's complaints of chronic, severe and intense pain and whether Plaintiff's testimony was somehow inconsistent with the medical evidence in the record or the record as a whole.  The Commissioner may be correct that substantial evidence exists in the record to support the ALJ's credibility finding; however, the ALJ failed to comply with the applicable procedural requirements when conducting the analysis.  Accordingly, a remand is warranted.

C.     REMAND FOR CONSIDERATION OF NEW EVIDENCE.

Plaintiff seeks a remand, in part, so that the ALJ can consider the medical evidence which was submitted subsequent to the hearing.  Plaintiff contends that the new and material evidence is material to the determination of disability.  The new evidence consists of a lumbar MRI and reports from Dr. Delliquadri, Dr. Barnett and Dr. Maggiano.

33

1.    WHAT CONSTITUTES NEW AND MATERIAL EVIDENCE?

A remand under 42 U.S.C. § 405(g) "sentence six" for consideration of additional evidence is warranted only if the evidence is "new" and "material" and "good cause" is shown for the failure to present the evidence to the ALJ.  *Ferguson v. Commissioner of Social Security,* 628 F.3d 269, 276 (6th Cir. 2010) (*citing Foster*, *supra,* 279 F.3d at 357).  These requirements are defined as follows:

> For the purposes of a 42 U.S.C. § 405(g) remand, evidence is new only if it was "not in existence or available to the claimant at the time of the administrative proceeding." ... Such evidence is "material" only if there is "a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." ... A claimant shows "good cause" by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ . . .  [T]he burden of showing that a remand is appropriate is on the claimant.

*Id.* (*citing Foster*, 279 F.3d at 357 (citations omitted); *see also Hollon v. Commissioner of Social Security*, 447 F.3d 477, 483 (6th Cir.2006)).

2.    REPORTS FROM DRS. MAGGIANO, BARNETT AND DELLIQUADRI AND THE MRI.

Upon review of the record, the Magistrate does not find that the evidence submitted by Dr. Maggiano satisfies the two factors required to show entitlement to remand under the standard of review.  Generated on May 31, 2011, Dr. Maggiano's report shows a consultative examination during which Plaintiff complained of neck pain and weakness.  After conducting an examination, Dr. Maggiano administered Depo Medrol® into Plaintiff's upper back.  Such report could have been provided for the ALJ and Plaintiff has failed to identify obstacles to the timely submission of this evidence.  Additionally, the report provides no updated test results or new findings and would not alter the ALJ's decision that Plaintiff was not disabled.

The evaluation by Dr. Barnett is new and Plaintiff had good cause for not submitting it to the ALJ.  However, Plaintiff's explanation as to why Dr. Barnett's opinion is material is

34

unpersuasive.  To the extent that Dr. Barnett saw Plaintiff once, adopted the findings in the record as to Plaintiff's diagnoses, did not prescribe any medication, encouraged Dr. Delliquadri to "stay the course" and then suggested steroidal injections, this evidence does not necessarily speak to Plaintiff's condition at the relevant time.  In fact, his impressions are based on treatment already administered by Dr. Delliquadri.

Similarly, the evidence submitted after the hearing based on records of Dr. Delliquadri was new and it was not available to Plaintiff at the time of the administrative proceeding.  This evidence is cumulative, representing a pattern of behavior that preceded the administrative proceeding--Plaintiff continued to complain that she was in pain and Dr. Delliquadri continued to prescribe pain medication and addressed the side effects from extended use of the pain medications.  Perhaps this evidence is material to the deterioration of Plaintiff's impairments but it was not material to the findings of disability that preceded the ALJ's decision.  In all probability, this evidence would not have changed the outcome of the proceeding

An MRI conducted on November 9, 2011, showing radiographic imaging of the cervical spine that showed space narrowing and dessication with degenerative spurring at C5-C6 and C6-C7; mild spinal canal stenosis at C5-C6; and disc bulging with broad based central disc protrusion at C6-C7 was duplicative of test results published on November 5, 2010.  At ST. JOSEPH, Plaintiff was diagnosed with paresthesia, NOS, from cervical disc disease.  The radiological evidence showed the same degeneration at C5-C6 and C6-C-7, spurring and severe stenosis (Docket No. 10, pp. 518-528; 893 of 941).  While the MRI administered on November 9, 2011 was new evidence that came to light after the ALJ made his decision, it was probably not material to the findings of the ALJ as it did not relate to the period before the date the ALJ rendered his decision.

Plaintiff has failed to show that the new evidence is material because it is not relevant to her

condition at the relevant time.  The Magistrate is not persuaded to order a sentence six remand.

## V. CONCLUSION.

For these reasons, this case is reversed and remanded to the Commissioner to:

1.    Perform a proper analysis of Dr. Delliquadri's opinions, provide reasoning for the weight given the opinions and if discounting such opinions, provide the procedural analysis required by Sixth Circuit precedent and Social Security Administration regulations;

2.    Comply with the applicable procedural requirements when conducting the credibility analysis and considering Plaintiff's complaints of pain; and

3.    Determine if based on the analysis of Dr. Delliquadri's opinions, all of the evidence, and the new credibility determinations, whether Plaintiff is disabled.

**IT IS SO ORDERED**.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:  June 26, 2013

36